UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JERRY WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:20-cv-00127-JRS-MJD |
| ) | |
| WEXFORD OF INDIANA, LLC, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jerry Wright alleges in this civil action that defendant Dr. Mitcheff denied Mr. Wright's treating physician's requests for him to be evaluated by an outside specialist for knee pain. He also alleges that defendant Wexford of Indiana, LLC (Wexford) maintains an unconstitutional policy of prioritizing profits over medical care which led Dr. Mitcheff to deny him treatment. The defendants have filed a motion for summary judgment. Dkt. 47. For the reasons below, that motion is **GRANTED**.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because the defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

Mr. Wright was an inmate at Wabash Valley Correctional Facility at all times relevant to his complaint. Wright Deposition, dkt. 47-1 at 12. In May 2017, he suddenly developed pain in his knee when he turned to speak to someone and heard his knee pop loudly. *Id*. at 20. When an X-ray

of his left knee showed abnormal results, Dr. Byrd ordered an MRI on May 9, 2017. Medical Records, dkt. 47-2 at 1-2. Mr. Wright received a knee sleeve on May 16, 2017. *Id*. at 3. An MRI was done in June 2017, and Dr. Byrd shared the results with Mr. Wright in July 2017. Dkt. 47-1 at 22; dkt 47-2 at 4-5. The MRI showed "chondromalacia" of the knee with "full thickness cartilage loss," a "subchondral cyst," and a meniscus tear.[1] Dkt 47-2 at 4-5. Mr. Wright reported to Dr. Byrd that the pain was so bad that he sometimes felt he might vomit. Dr. Byrd discussed the poor prognosis of knee arthroscopy and Mr. Wright indicated that he would like to try a corticosteroid injection. *Id*.

Mr. Wright received a corticosteroid injection on August 25, 2017. *Id*. at 8. When he saw Dr. Byrd on December 7, 2017, he reported that the injection effectively managed his pain for approximately three months, and he wished to continue to manage his pain with injections. *Id*. at 9-10. He also requested a universal knee sleeve. *Id*. He received a second injection in his left knee of December 8, 2017, and received a universal knee sleeve on December 19, 2017. *Id*. at 12-13.

Mr. Wright saw Dr. Byrd on April 26, 2018 to discuss his knee pain. Dr. Byrd told him that he was too young for a total knee replacement and that the prognosis was poor for arthroscopy. *Id*. at 14. Mr. Wright requested a consultation with an outside orthopedist. *Id*. Dr. Byrd ordered updated X-rays of the knee, a trial of Cymbalta for pain, and a likely orthopedic consult pending the X-ray results. *Id*. at 16. Mr. Wright later asked to discontinue the Cymbalta because it caused him to vomit. *Id*. at 18-19.

On May 24, 2018, Mr. Wright again saw Dr. Byrd regarding his knee. He reported that his last two injections in December and January had provided pain relief for less than four weeks each.

---

[1] Chondromalacia is knee pain caused by the breakdown of cartilage. Knee Pain, Cleveland Clinic, available at https://my.clevelandclinic.org/health/diseases/15607-knee-pain-chondromalacia-patella (last visited August 3, 2022).

3

*Id*. at 22. Dr. Byrd told him that the medical team advised watching meniscal tears for up to two years to see if it might naturally repair itself. *Id*. Dr. Byrd ordered an addition injection (which Mr. Wright received the following day), a ReddiBrace, Tylenol, and Capsaicin cream. *Id*. at 24-26.

At his September 13, 2018, visit Mr. Wright reported that Tylenol and Capsaicin cream made his knee pain tolerable, so Dr. Byrd refilled his prescriptions. *Id*. at 27-30. Dr. Byrd again refilled the prescriptions at Mr. Wright's October 4, 2018, visit although he noted that they were minimally effective. *Id*. at 32-34. On October 22, 2018, Dr. Byrd requested an outside orthopedic evaluation for Mr. Wright. *Id*. at 36-38.

The following day, Dr. Mitcheff reviewed Dr. Byrd's request and responded with an alternative treatment plan. *Id*. at 41. Instead of seeing an outside orthopedic specialist, Dr. Mitcheff recommended a trial of physical therapy, a knee sleeve with patellar cut out, a job with minimal walking required, and a reduction in Mr. Wright's BMI to less than 25. *Id*.

Dr. Byrd issued a request for a physical therapy evaluation on December 24, 2018, due to Dr. Mitcheff's physical therapy recommendation. *Id*. at 42-45. Dr. Mitcheff again denied the request and altered Mr. Wright's treatment plan to include range of motion exercises he could complete at the prison's medical department. *Id*. at 48. Dr. Byrd discussed this alternative plan with Mr. Wright on January 17, 2019. In addition to the exercises, Dr. Byrd increased Mr. Wright's Mobic prescription, added a trial of Pamelor, and ordered additional X-rays. *Id*. at 49-51. Mr. Wright testified at his deposition that he completed the physical therapy exercises in his cell block, and that they worked "for a little bit and then went right back to the way it was hurting all the time." Dkt. 47-1 at 28-29.

On March 12, 2019, Mr. Wright reported to a nurse that he had begun to experience pain in his right knee. *Id*. at 29; dkt. 47-2 at 53-55. He was seen by Dr. Byrd on March 21, 2019, and

4

received a corticosteroid injection in his right knee on March 22, 2019. *Id*. at 56-61. He received an injection in his left knee on May 10, 2019. *Id*. at 62.

Dr. Byrd again requested an orthopedic consult for Mr. Wright on July 5, 2019. *Id*. at 67-70. On July 9, 2019, Dr. Mitcheff again denied the request and issued an alternative treatment plan that included Mr. Wright reducing his BMI to 22, or at least below 25, and addressing Mr. Wright's high lipids and blood pressure. Dr. Mitcheff also noted that Mr. Wright should be informed that the next step before an orthopedic consult would be transferring to a facility with in-house physical therapy. *Id*. at 73.

On July 11, 2019, Dr. Byrd communicated the alternative treatment plan to Mr. Wright. Mr. Wright stated that he was not willing to transfer to another facility, but he agreed to try another drug, Keppra, for pain management. *Id*. at 75-77. On September 5, 2019, Mr. Wright reported that he had experienced a surprising improvement of his knee pain with Tylenol and Keppra. *Id*. at 79-82.

On November 27, 2019, Mr. Wright requested two new knee braces, and Dr. Byrd approved his request. *Id*. at 84-86. Mr. Wright received a corticosteroid injection in his right knee on February 28, 2020, and in his left knee on March 13, 2020. *Id*. at 87-88.

At his deposition, Mr. Wright testified that he believes Wexford employees deny necessary medical treatment because they don't follow the actual policy regarding treatment. Dkt. 47-1 at 38.

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth

5

Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For the purposes of this motion, the Court assumes that Mr. Wright's knee pain is a serious medical condition. To survive summary judgment then, he must show that the defendants acted with deliberate indifference—that is, that they consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

### A.  Dr. Mitcheff

Mr. Wright contends that Dr. Mitcheff acted with deliberate indifference when he provided alternative treatment plans in response to Dr. Byrd's requests for consultation with an outside specialist and for outside physical therapy. Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate

6

indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42. Medical professionals are afforded "a great deal of deference in their treatment decisions," and "a constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (cleaned up).

    Here, there is no evidence that Dr. Mitcheff's alternative treatment plans were so far afield of accepted standards that they raise an inference that they were not based on medical judgment. Dr. Byrd agreed that Mr. Wright was too young for a total knee replacement and that the prognosis for arthroscopy was poor. Dr. Byrd thought it was time for Mr. Wright to be seen by an outside specialist. But Dr. Mitcheff ordered that Mr. Wright do range of motion exercises and attempt to reduce his BMI and other risk factors before being sent to an outside specialist. Although Mr. Wright, and even Dr. Byrd, disagreed with Dr. Mitcheff's treatment decisions, such disagreement alone does not establish that Dr. Mitcheff acted with deliberate indifference. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

    Dr. Mitcheff's requirement that Mr. Wright transfer to a facility that provided in-house physical therapy before being sent for outside treatment was reasonable and did not exhibit deliberate indifference. Meanwhile, Dr. Byrd's continued attempts to find a pain medication that worked paid off for Mr. Wright when the combination of Tylenol and Keppra provided him a surprising amount of pain relief. Mr. Wright also reported that the range of motion exercises ordered by Dr. Mitcheff provided relief for a period of time. The fact that Mr. Wright still suffered

from some knee pain does not indicate that Dr. Mitcheff was deliberately indifferent. *See Leiser v. Hoffman*, --- F. App'x ---, 2021 WL 3028147, *3 (7th Cir. July 19, 2021) ("[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain.") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Furthermore, Mr. Wright is not entitled to any specific course of treatment and cannot prevail on a deliberate indifference claim solely because he disagrees with Dr. Mitcheff's medical judgment that he must reduce his BMI, address other risk factors, and attempt in-house physical therapy before being sent to a specialist. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care"). Because no reasonable juror could find that Dr. Mticheff was deliberately indifferent to Mr. Wright's serious medical needs, he is entitled to judgment as a matter of law.

### B. Wexford

Because Wexford acted under color of state law by contracting to perform a government function—providing healthcare services to inmates—it is treated as a government entity for purposes of 42 U.S.C. § 1983 claims. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). Therefore, a claim against Wexford must be based on a policy, practice, or custom that caused a constitutional violation. *Id.*; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). To prevail on such a claim, "a plaintiff must ultimately prove three elements: (1) an action pursuant to a municipal [or corporate] policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal [or corporate] action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020).

Mr. Wright contends that Wexford maintains a practice of denying medical treatment to save money and provide bonuses to Wexford employees. Dkt. 51 at 2. His response brief cites several provisions of Wexford's response to the Indiana Department of Correction's Request for Proposals when Wexford bid on the contract to provide medical care in Indiana prisons. *Id*. The defendants attached to their reply the provisions cited by Mr. Wright. Dkt. 55-1 through 55-5. Nothing in the provisions states that Wexford will deny medical treatment for financial reasons. Instead, Wexford agreed to minimize off-site care due to security and safety concerns by prioritizing tele-health and on-site services. Dkt. 55-1 at 1-2. In another response, Wexford highlights its prospective review program that seeks to ensure the "medical necessity" of non-urgent offsite services while "never denying appropriate care." Dkt. 55-3 at 3.

These provisions indicate that Wexford intended to provide cost-effective, appropriate healthcare to inmates. It is not a constitutional violation to fail to provide unnecessary medical treatments. The Court notes that one provision indicated that Wexford would provide onsite physical therapy at Wabash Valley. Dkt. 55-2 at 5. But its failure to abide by this statement is not a constitutional violation. Mr. Wright could have received onsite physical therapy at another facility had he consented to being transferred there.

There is no evidence in the record that Wexford maintained an unconstitutional policy, practice, or custom of denying or delaying appropriate treatment for inmates to save money. Wexford is therefore entitled to summary judgment.

### IV.
### Conclusion

The defendants' motion for summary judgment, dkt. [47], is **GRANTED.** Mr. Wright's motion for pretrial settlement conference, dkt. [59], is **denied as moot.**

Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 08/13/2022

                                      JAMES R. SWEENEY II, JUDGE
                                      United States District Court
                                      Southern District of Indiana

Distribution:

JERRY WRIGHT
142040
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Heather Terese Gilbert
CASSIDAY SCHADE LLP
hgilbert@cassiday.com